CHARLES FULLER, Respondent, *v.* BRADLEY CONTRACTING COMPANY, Appellant.

Second Department, May 3, 1918.

Principal and agent — action for commissions for procuring contract with foreign government for purchase and sale of munitions — contract construed.

Where a contracting company being desirous of procuring a contract for the manufacture and sale of munitions to a foreign government, which insisted upon said company's obtaining the plant of another company as a condition precedent to the execution of the contract, agreed by letter to pay a very large commission to an attorney for his services " in event of such contract being accepted and executed by us," and further agreed that said commission " shall become due and payable only as and when and in the same proportion as we receive payment from the purchaser; that is to say the commission is only to be paid out of the payments under the contract," it is the plain intent of the agreement that the attorney was not entitled to commissions unless the contract with the foreign government was executed, that is, performed, and not then, unless the contracting company actually received the money payable to it upon performance; but the right to commissions cannot be defeated by capricious refusal on the part of the contracting company to proceed with the contract or by fraud or deceit practiced with a view to relieve it from its lawful obligations.

The meaning of the words " executed by us " is that the contract was to be performed and the word " executed " does not refer to the mere signing of the contract.

In an action to recover commissions under such contract, evidence *held* insufficient to establish that it was the intention of the parties that the plaintiff was to be entitled to commissions upon the signing of the contract between the foreign government and the defendant or that the failure of performance was due to any act or default on the part of defendant.

THOMAS, J., dissented, with opinion.

APPEAL by the defendant, Bradley Contracting Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Nassau on the 2d day of February, 1917, upon the verdict of a jury rendered by direction of the court, both sides having stipulated, during the course of the trial, that the jury might be discharged and the trial proceed before the court as if a jury were present and the court be empowered to direct a verdict with the same force and effect as if a jury were present.

An appeal is also taken from the order entered in said clerk's office on the 31st day of January, 1917, denying defendant's motion for the direction of a motion in its favor.

The plaintiff, an attorney at law, practicing in the borough of Manhattan, city of New York, sued the defendant to recover $400,000 for commissions which he claimed were due him. The complaint alleges that on or about October 4, 1915, plaintiff and defendant made an agreement whereby the defendant agreed to pay the plaintiff, in consideration of services to be rendered by him in securing for defendant a contract with the Imperial Russian government, as plaintiff's compensation and commission, forty cents per 1,000 cartridges upon 1,000,000,000 cartridges, amounting to the sum of $400,000, it being understood that the time for the payment of commission would be as and when and in the same proportion as the defendant received payment for the cartridges; that as a result of the plaintiff's effort, on or about October 15, 1915, he secured for the defendant a contract dated on that day, with the Imperial Russian government, duly executed on behalf of that government, for the manufacture and sale by defendant for and to that government of 1,000,000,000 cartridges, at the rate of $37.50 per 1,000, to be paid therefor to the defendant by the Russian government, and that the contract so secured by plaintiff was, on or about October 15, 1915, accepted, executed and delivered by the defendant.

Second Department, May, 1918.    [Vol. 183.

Plaintiff alleges that at the time of the execution of the contract, the defendant was not a manufacturer of cartridges or other munitions of war, and had no plant suitable for such manufacture; that a corporation known as the Savage Arms Company was the owner of a manufacturing plant at Utica, N. Y., which, in the opinion of the Russian government, was capable of being made suitable for the manufacture of cartridges; and that on or about September 29, 1915, as a necessary means of acquiring a plant or the control thereof, which would be acceptable to said government for the manufacture of said cartridges, and as an inducement to said government to enter into said contract with the said defendant, the defendant entered into a contract on that day with the owners and holders of a majority of the outstanding capital stock of the Savage Arms Company, by which it was agreed that the vendors would sell to the defendant, and the defendant would take and pay for, the amount of capital stock specified therein and constituting a majority thereof, and that the existence of this contract between the defendant and the said vendors of the majority of the stock of the Savage Arms Company was known to said Imperial Russian government and was a controlling inducement to said government in the execution and delivery by it of its said contract with the defendant of October 15, 1915; and it was provided, amongst other things, in and by said contract with the Imperial Russian government so secured by plaintiff for defendant and so accepted and executed by defendant, that it was a condition precedent to the performance thereof by the Imperial Russian government that defendant should first acquire the said plant of the Savage Arms Company and control of its board of directors and of its executive officers; and the performance of the said contract between the defendant and the vendors aforesaid was the only means available to the defendant by which it could comply with such condition precedent. The complaint then proceeds to the allegations that after the execution and delivery of the contract of October 15, 1915, the time for the sale and delivery of the capital stock of the Savage Arms Company to the defendant was extended to November 17, 1915, and that on that day the vendors duly tendered the stock and the defendant refused to comply

with the terms of the agreement with the Savage Arms Company, and that defendant, through no fault of plaintiff or of the vendors of the stock or of the Imperial Russian government, refused and neglected to comply with the terms of its contract with the vendors, or to take and pay for the stock of the Savage Arms Company, and wholly abandoned its contract with them, and, in consequence, the stock of the Savage Arms Company was sold and transferred to other persons, and that it became impossible for the defendant to acquire the Savage Arms Company's plant. It is also alleged that through no fault of the plaintiff, but solely through the fault of defendant, defendant failed and neglected to comply and at all times since November 17, 1915, has been and will be unable to comply with the requirements of its said contract with the Imperial Russian government in that it did not acquire the plant of the Savage Arms Company therein referred to, and that all opportunity for defendant to receive payments under the contract with the Russian government was abandoned by the defendant and terminated solely through the fault of the defendant and its failure, refusal and inability to carry out the terms thereof and without any fault on the part of the plaintiff.

The answer denied the material allegations of the complaint, admitted the execution of the agreement of October 4, 1915, and pleaded the terms of the paper executed between defendant and the Russian government, including a provision that it was not to become effective until the defendant acquired the plant of the Savage Arms Company and the other conditions therein stated. In addition, the defendant, by its amended answer, alleges that it was understood and agreed by and between the plaintiff and the defendant that said proposed contract, containing such requirements, was not such a contract as plaintiff agreed to obtain or as was contemplated between plaintiff and defendant, and that the formal signing and execution of said proposed or preliminary contract between the defendant and said government did not and would not be a compliance with the agreement between plaintiff and defendant in regard to said contract, or entitle plaintiff to said compensation or commissions, unless and until defendant was able to or could, on terms satisfactory to it, acquire the plant and control of said Savage Arms Company, as stated,

and also comply with all the other requirements mentioned, in order to make said contract effective and binding, and until thereafter defendant had made delivery of cartridges under said contract and received payment therefor. Upon said understanding and conditions, defendant executed said contract with said government.

At the opening of the trial a motion was made by the defendant on the pleadings for a dismissal of the complaint, which motion was denied. The defendant and its officers were not ammunition makers. Their principal enterprise was as subway builders in the city of New York. They had no experience in the making of cartridges or ammunition, and no factory or plant for such work. It appears that early in 1915 they contemplated entering the field of munition manufacturers, and in connection with some contract with the British government they had endeavored to purchase an ammunition factory in Vermont. They had met the plaintiff in connection with that proposed contract, and if it had been obtained he was to receive a commission based on the amount of the contract. These negotiations took place in the early part of June, 1915, but they were fruitless. Defendant did not obtain the contract, and an option secured on the factory in Vermont was given up. After that the defendant's officers had conversations with plaintiff concerning the possibility of securing munition contracts with the Italian and Canadian governments, but nothing came of them. In July the plaintiff stated that, although the other deals had fallen through, there was another ammunition plant available, mentioning the plant of the Savage Arms Company of Utica, N. Y., which was not only one of the best plants but " in fact the only plant left that could carry out a large contract, and he thought if he could get that plant that he could get a Russian contract " by reason of his relations with the advisers and representatives of the Russian government in New York city. It is also in evidence that one De Florez, a brother-in-law of plaintiff's brother, Paul Fuller, Jr., was or claimed to be in intimate relations with the members of the commission sent here to represent the Russian government in the purchase of the ammunition. According to defendant's testimony, the president, Frank Bradley, said: " Well, if

you can get the plant and we can get a contract, we are game to go into this." The Russian commissioners, desiring to procure 1,000,000,000 cartridges involving an expenditure of some $37,500,000, insisted that the cartridges should be manufactured at the plant of the Savage Arms Company at Utica, N. Y. For some reason, however, instead of dealing directly with these munition manufacturers, the commissioners saw fit to deal with the defendant subway builder, and the contract which plaintiff asserts he procured, dated October 15, 1915, expressly provided that " The manufacturing shall take place at the plant of the Manufacturer at Utica, New York," and that it should not become effective until " the Manufacturer (a) has acquired the plant of the Savage Arms Company, control of its Board of Directors and of all of its executive officers. (b) has secured the services of experts who thoroughly understand and are experienced in the manufacture of cartridges. (c) shall have made contracts for the raw materials necessary for the manufacture of the cartridges and also contracts for machinery and structures to effect a substantial enlargement of the plant of the Savage Arms Company at Utica, New York. (d) has delivered bond hereinabove referred to for Two million ($2,000,000) Dollars [*i. e.,* a bond for the faithful performance of the contract] and has submitted proof of the facts in ' a,' ' b ' and ' c ' hereof to the Purchaser." This indirect method of doing business involved the payment of very large sums as commissions, bonuses, etc., and finally brought about the collapse of the defendant's efforts to go into the business of manufacturing munitions. The plaintiff, who testified that he had been a member of the bar for fifteen years and had never been in the brokerage business " unless this contract is called brokerage," was promised a commission of fifty cents per 1,000 cartridges, which would amount to $500,000, instead of the $400,000 for which he has been awarded judgment. Mr. De Florez, his brother's connection by marriage, asserts a claim against the defendant in a similar amount, and the executive officers of the Savage Arms Company obtained a payment of $100,000 in cash from the defendant for an option to purchase the capital stock of that corporation (par value $1,000,000) for $4,288,000, this last sum including

a personal " bonus " to the executive officers negotiating the contract fixed at first at $1,200,000 and later increased to $1,700,000. These very substantial sums were to come out of the money to be paid by the Imperial Russian government for its supplies of ammunition. The contract with the Russian commissioners further provided for monthly deliveries of the cartridges, beginning in February, 1916, and continuing in amounts specified so that delivery would not be completed until the end of the year 1917. Payments were to be made monthly on each delivery, but the Russian government was to make an immediate deposit of twenty-five per cent of the entire purchase price — between $9,000,000 and $10,000,000 — in some bank or trust company in New York city, to be applied to the payment of twenty-five per cent of each monthly installment, and the manufacturer was given the right to request and receive the whole or any part of the entire deposit on giving a second bond in the amount withdrawn for the faithful performance of the contract. The plaintiff, as well as the defendant's officers, set about the purchase of the stock of the Savage Arms Company, which was a condition precedent in the Russian agreement, and various negotiations were had with the executive officers of that corporation, who under the somewhat anomalous situation really controlled the whole matter. The plaintiff testifies that he was employed by the defendant to secure the stock of the Savage Arms Company, and on September 29, 1915, the executive officers of that company made a written agreement with defendant in consideration of the payment of $100,000 in cash, to sell and deliver 6,400 of the 10,000 shares of stock of the Savage Arms Company at the price of $380 per share, aggregating $2,432,000, with an additional payment to the executive officers " in case this option is carried out," of $1,700,000, the additional payment or " bonus " being said to be in consideration of their written, " personally or collectively, agreement not to engage in the manufacture or sale of firearms or ammunition within the limits of the United States of America for a period of five (5) years from the date hereof, unless the party of the second part consents thereto in writing." In oral negotiations prior to this written agreement the additional payment was a " bonus " without condition, and was $500,000 less than the

amount stated in the written option.   On October 4, 1915, the plaintiff prepared, and defendant through its president signed, four letters to cover plaintiff's commission of fifty cents per 1,000 cartridges.   The commission aggregated $500,000, not $400,000 as demanded in the complaint.   The first three letters were identical except in so far as they referred to the amount of the commission.   It will be noted that each letter states the amount therein referred to, to be "full and complete compensation and commission."   Three of the letters were in the following form:

"BRADLEY CONTRACTING COMPANY
"ONE MADISON AVENUE
"NEW YORK
"*October 4, 1915.*

"MR. CHARLES FULLER,
"115 Broadway,
"New York City:
"DEAR SIR.— In consideration of the services rendered by you in securing a contract for us with the Imperial Russian Government for the manufacture and sale of One billion (1,000,000,000) cartridges, we agree to pay you, in event of such contract being accepted and executed by us, as full and complete compensation and commission ten cents (.10c) per thousand cartridges, amounting on the above order of 1,000,000,000 cartridges to the sum of One hundred thousand dollars ($100,000).

"It is understood that the commission mentioned above shall become due and payable only as and when and in the same proportion as we receive payment from the purchaser; that is to say the commission is only to be paid out of the payments under the contract.

"Yours very truly,
"BRADLEY CONTRACTING COMPANY,
"FRANK BRADLEY."

The first letter promised a full and complete compensation and commission of ten cents per 1,000 cartridges, which would amount to $100,000.   The second letter a full and complete compensation and commission of thirteen and one-third cents per 1,000 cartridges, which would amount

to $133,333.33. The third letter a full and complete compensation and commission of sixteen and two-thirds cents per 1,000 cartridges, or $166,666.66. The three letters together aggregate the amount claimed in the complaint in this action. The fourth letter requisite to make the total commission of $500,000, was not offered in evidence by the plaintiff, nor is it presented as part of his cause of action although he testified that there were four letters. The fourth letter of even date with the other three was offered in evidence by the defendant, and is as follows:

"*October* 4, 1915.

" Mr. Charles Fuller,
        " 115 Broadway,
                " New York City:

" Dear Sir.— In consideration of services rendered by you in connection with the purchase of the Savage Arms Co., or control of the same, we herewith agree to pay to you, Charles Fuller, your heirs or assigns, the sum of One hundred thousand dollars ($100,000.00) as full and complete compensation for legal services performed by you for us.

" It is understood that the above mentioned legal fee shall become payable only in event of the deal for the purchase of the Savage Arms Co., or control thereof shall have been completely consummated.

                " Yours very truly,
                " BRADLEY CONTRACTING COMPANY,
                        " (Signed)        Frank Bradley."

The plaintiff testified that these four letters constituted his contract and agreement concerning commissions. He was asked to explain why it was divided up in this way, and answered " For banking reasons. In the event this commission was paid, and when it was paid, I could, if I chose, assign these letters or deposit these letters in any bank or trust company, as I saw fit, and authorize the bank or trust company to pay the money as I directed." He was asked by his counsel: " Q. You — some people aided you in these negotiations? A. Of course I did. Q. And it was divided in this way to cover up the claims for commissions of those who had aided you? A. Certainly." Defendant's witnesses said that

the commission was divided up in this way at plaintiff's request, so that he might exhibit it to persons who might make a claim upon him, but whose right to compensation he disputed, one letter as evidencing the full and complete compensation and commissions. The defendant assisted by the plaintiff endeavored to acquire the stock of the Savage Arms Company. On October 19, 1915, after the signing of the agreement with the Russian commissioners, defendant notified the executive officers of the company that it desired to exercise its option to purchase the stock and that it would require fifteen days to make the necessary financial arrangements. The defendant desired to complete the transaction on which it had already deposited $100,000 in cash, but difficulties and misunderstandings were encountered almost immediately. Defendant insists that there was at all times an understanding with the executive officers of the Savage Arms Company, to which plaintiff was a party, that payment of a part only of the consideration for the stock was to be made on delivery, and that defendant was to pay the greater part of the consideration and bonus out of the deposit to be made by the Russian government on the acquisition of control by defendant of the Savage Arms Company, which deposit would be immediately available for that purpose, and defendant insists that it was so arranged and that plaintiff took part in the arrangement, offering to act as stakeholder holding the stock in the short interim necessary to turn over the money. But as the day fixed for closing the transaction came on October 30, 1915, the officials of the Savage Arms Company refused to turn over the stock except on payment of the entire sum required in cash. The time for closing was extended to November 12, 1915. It was said that some of the stock to be delivered was deposited as collateral in banks in Utica and could not be withdrawn without cash payment. Bradley, the defendant's president, although insisting that it was contrary to his understanding, raised $2,000,000 in cash, and actually offered the gentlemen representing the Savage Arms Company $1,043,000 in cash, consenting that the stock be held in escrow until he could withdraw enough of the Russian deposit to pay the balance. In all these proceedings the plaintiff took an active part. There was a final post-

Second Department, May, 1918.        . [Vol. 183.

ponement of the closing to November 17, 1915. The Bradleys in the meantime applied to banks and financial institutions in New York city for a loan of the necessary funds, offering to consent to most extravagant terms for the accommodation, including not only the pledge of the contract, but their city subway contracts as well. For some reason, however, the proposed financial assistance from the bankers did not materialize. There is some suggestion in the evidence that there was objection to the Bradleys breaking into the profitable field of manufacturing munitions. On November 17, 1915, the executive gentlemen from Utica, after an apparently amicable meeting in the morning, returned after lunch and formally tendered the stock to the Bradleys, demanded $4,288,000 in cash and on non-payment declared the option forfeited and the deal off, involving incidentally the loss to Bradley of the $100,000 deposited on the signing of the agreement. The following day the plaintiff and defendant's counsel again saw the gentlemen from Utica, who, while declaring the deal off, said that if Bradley would then and there pay $1,000,000 on account they would hold the matter open for a few days, but unless it was then closed " why the million is ours." This was November 18, 1915. The defendant claims that at this time the officials of the Savage Arms Company were in negotiation with other parties, and had arranged to sell the control of the company at a price far in excess of the sum stated in the Bradley option, and that such sale was actually made within a few days thereafter. On November 22, 1915, the plaintiff wrote the defendant demanding " the fee agreed upon in your letter of the 4th of October, 1915, and which as you will recall was due and payable as soon as you had completely secured the contract for the purchase of the Savage Arms Co. I regret that you were unable to carry out the contract and that the splendid opportunity which it offered in conjunction with the Russian Contract has been lost." And on December 10, 1915, plaintiff's counsel wrote defendant that plaintiff had placed in their hands " his two claims against you — one for One hundred thousand Dollars, for services rendered you in connection with the contract for the purchase of control of the Savage Arms Company, and the other for Four hundred thousand dollars, arising out of your agree-

ment with him for securing the contract with the Russian Government for the manufacture and sale of one billion cartridges."

Mr. Fuller, the plaintiff, testified that in all of the negotiations he never talked with the members of the Russian commission personally; that he never dealt with them directly in any way; that he employed Mr. De Florez and agreed to pay him for his services in conducting negotiations directly with the commission.

*Albert B. Boardman* [*Morgan J. O'Brien, Frederick L. C. Keating* and *George · Edwin Joseph* with him on the brief], for the appellant.

*Delancey Nicoll* [*Thomas S. Fuller, Courtlandt Nicoll* and *Joseph Walker Magrauth* with him on the brief], for the respondent.

KELLY, J.:

The record in this case is voluminous, and the amounts involved are very large, but the legal principles involved are comparatively simple. The plaintiff seeks to recover commissions as a broker under employment by the defendant; he alleges that he has performed his part of the contract and demands payment. Naturally the questions involved are, What was the plaintiff's contract? Was it performed and is he entitled to payment? The case comes to this court without findings of fact or conclusions of law by the learned trial judge. Originally, a jury was impaneled and the trial was commenced, but, on the second day, the counsel for both parties called the attention of the trial justice in chambers to an attempt made to tamper with the jury and to bring about a verdict in favor of one of the litigants by bribery. The facts of this transaction are before this court in the case of *People* v. *Bennett* (182 App. Div. 871), in which it appears that the defendant Bennett was convicted and sent to State prison for his activities in the matter. The attention of the learned trial justice having been called to the circumstances, it was agreed that the jury be discharged, that a jury be

waived, and that the case proceed to trial before the court without a jury, and that " the court be empowered to direct a verdict with the same force and effect as though a jury were present." This is not very definite. It is true, the language used by the trial justice who dictated the stipulation was that " the court be empowered to direct a verdict with the same force and effect as though a jury were present." This is open to the construction that it meant that the court might " render " a verdict, instead of the technical interpretation of the provision for " directing " a verdict. The appellant makes the point that the judgment is void because of the absence of findings of fact or conclusions of law, citing Code of Civil Procedure, sections 1010 and 1022 (which last section he says is mandatory); *Electric Boat Co.* v. *Howey* (96 App. Div. 410); *Gilbert* v. *Finch* (72 id. 38), and *Heinitz* v. *Darmstadt* (140 id. 252). The respondent urges that at the end of the case both parties moved for the " direction of a verdict," and that the effect of such joint motions is to invest the trial justice with all the powers of a jury, and that the parties thus consented that the court should decide all questions whether of law or of fact. (*Ormes* v. *Dauchy,* 82 N. Y. 443; *Dillon* v. *Cockcroft,* 90 id. 649; *Thompson* v. *Simpson,* 128 id. 270; *Sigua Iron Co.* v. *Brown,* 171 id. 488.) The respondent says that under the amendment to section 1317 of the Code this court has power to make the necessary findings and on such findings to render final judgment. (*Bonnette* v. *Molloy,* 209 N. Y. 167; *Lamport* v. *Smedley,* 213 id. 82; *Acme Realty Co.* v. *Schinasi,* 215 id. 495; *Catskill National Bank* v. *Lasher, No. 1,* 165 App. Div. 548; affd., 221 N. Y. 551.) At the conclusion of the testimony the plaintiff moved for the direction of a verdict for the full amount, with interest. The defendant's counsel, opposing the motion, asked whether the court would hear argument, or take briefs, to which the learned trial justice replied that he assumed both sides asked for the direction of a verdict. " That was the understanding when I took up the case." Again this indicates that the court and counsel were acting on the theory that they were to ask the court to " render " a verdict, instead of the more technical " direction " of a verdict, because it is apparent that at the outset of the trial neither litigant

assumed that there was to be a direction of a verdict in the strict sense. Thereupon, the defendant's counsel moved that the court " direct a verdict on the behalf of the defendant in this action on the ground no cause of action has been proven, and not the cause of action alleged in the complaint," and renewed the motion to dismiss the complaint " upon all the evidence, which I made at the close of the plaintiff's case, and upon the grounds, each and every one there stated. The Court: You can incorporate that too in the grounds for a direction of a verdict. Do you want me to pass on the motions now or submit briefs? Mr. Uterhart [of counsel for plaintiff]: Now. Mr. Nicoll: I understood your Honor was going to try this case and so the stipulation reads, as though the case was tried before a jury. The Court: There are a couple of questions of law involved. Do you want to put in briefs on those? If you don't, I am ready to direct a verdict now. Mr. Conway: I would like to put in a brief on the law, and put in a brief on the facts, or argue the facts briefly. The Court: Two weeks to submit briefs." Ordinarily a litigant who asks for the direction of a verdict has the opportunity, if his motion be denied, to request that he may go to the jury on the facts, and apparently the learned counsel for the defendant thought there were facts to discuss. The trial having been concluded and these proceedings had on November 27, 1916, the court on January 5, 1917, filed its opinion without findings of fact or conclusions of law, directing a verdict " under the stipulation " for the plaintiff for $400,000, " but without interest, the time of payment thereof having by agreement been postponed." (98 Misc. Rep. 382.) It would have been the better practice to have procured findings of fact and conclusions of law by the learned trial justice. An examination of his opinion filed leads to the conclusion that he decided the case on the theory that it involved questions of fact as well as questions of law, because while he holds that the plaintiff's commissions were earned by what he describes as the " acceptance by defendant " of the Russian contract and its " formal execution and delivery," it is evident that in so holding he must have passed upon the intention of the parties as disclosed by the evidence, and in his reference to the various defenses interposed it is apparent that he assumed

to decide them as questions of fact. At the close of his opinion he says: " Under the authorities the plaintiff is entitled to his commissions even though there is a failure of performance, the failure being due entirely to the act and fault of the defendant." This would also appear to involve questions of fact.

We are constrained to differ with the learned trial justice in his interpretation of the contract between the parties. We think the plain intent of the written letters evidencing the agreement, prepared by the plaintiff, an attorney at law, is that he was not entitled to commissions unless the contract with the Russian government was executed, that is, performed, and not then unless the defendant actually received the money payable to it upon performance. This in our opinion is the plain wording of the written contract, and this interpretation is confirmed by all of the evidence in the case. In an ordinary real estate transaction, a broker performs his work when he brings the vendor and the purchaser together, and he does not assume the risk of performance. His work is done when he introduces a willing purchaser to the vendor, and the contract is made. The broker does not assume responsibility for the vendor's title or the purchaser's responsibility. And it is also true that in the ordinary case where a broker stipulates that his commission shall not be payable until the closing day, such agreement does not discharge the principal from the obligation to close the contract in a reasonable time, or if the broker stipulates that his commission shall be paid out of the proceeds of the transaction, the principal cannot defeat recovery by failure on his part to perform his own obligations. These are elementary rules and founded on elementary principles of fair dealing. But no one will dispute the proposition that a broker may make any legitimate agreement as to his services and payment therefor which may suit the transaction and accord with the desires of all concerned. A broker may bind himself not to demand payment unless the contract is actually carried out. He may, if he sees fit, agree that he shall have no claim for commissions unless his principal actually receives the fund from which the broker's compensation is made payable. Such agreements are lawful and proper and not unusual. Even

in such case, the broker has the right to insist on good faith on the part of his principal. His right to commissions cannot be defeated by capricious refusal on the part of the principal to proceed with the contract, or by fraud or deceit practiced with a view to relieve the principal from his lawful obligations. The plaintiff in the present case makes no claim, and certainly the evidence disproves any suggestion that the defendant and its officers were not willing and anxious to carry out the contract. They did their utmost to secure it; they paid $100,000 in cash to the officials of the Savage Arms Company for the option to purchase the stock and control of the plant of that company. The anomalous situation arising from the action of the Russian commissioners in insisting that the cartridges be manufactured at the particular plant of the Savage Arms Company in Utica, N. Y., and yet dealing with the defendant company without experience or facilities in ammunition making, and insisting in the contract as a condition precedent that defendant must acquire control of the Savage Arms Company plant, which put the performance of the contract entirely in the hands of the executive committee of that company. They were not parties to the agreement between the defendant and the Russian government, but they had complete control of the situation. They could demand whatever price or conditions suited their fancy. As it was, they named a price for the stock which netted a profit to the stockholders so enormous as to be almost unconscionable, and in addition demanded a " bonus " for their personal service, first of $1,200,000 and later of $1,700,000. But the defendant agreed to their demands, paid $100,000 in cash for the option, and exhausted every effort to raise the enormous sum in cash necessary to satisfy their demands. There is no doubt, on the evidence, that the plaintiff understood the situation fully from the outset. He fully understood the defendant's position and financial condition, and appreciated the fact that defendant could not carry the Russian contract through unless he procured the plant of .the Savage Arms Company. It was the plaintiff who called defendant's attention to the Savage Arms Company's plant and who suggested that if the plant could be purchased the Russian contract could be obtained. It was the plaintiff who undertook to

introduce the defendant's officers to the officers of the Savage Arms Company and to procure the sale of the munition plant to these subway contractors with the knowledge on the part of the vendors that their property thus sold was essential to the performance of defendant's contract involving an expenditure by the Russian government of $37,500,000, and a profit to defendant estimated by the learned counsel for plaintiff on the argument of $10,000,000. Indeed, the plaintiff understood the situation far better than the defendants, who may have been familiar with the ramifications of city subway contracts, but who were decidedly out of their sphere in their new enterprise. In their efforts to enter the field of the munition contractors, they were on unfamiliar and dangerous ground. The plaintiff says he never saw the Russian commissioners; he left it all to a man named De Florez, a brother-in-law of plaintiff's brother, Paul Fuller, Jr. Mr. De Florez, who was not called as a witness on the trial, is said to have been socially intimate with some of the officers composing the commission. It appears that De Florez also obtained a promise from the Bradleys to pay him $500,000. Mr. De Florez appears to have handled the Russian commission as the agent of the plaintiff. The defendants testified that he agreed to procure modifications of the contract to suit defendants if they would put up $100,000 for obvious purposes. The defendants refused to pay the money, and the plaintiff is said to have criticised their business acumen, and even the learned and experienced counsel for the plaintiff answered Bradley's denunciation of De Florez at the trial by saying: " Q. As a matter of fact, Mr. Bradley, of course you rejected at once any proposition to corrupt anybody? A. I didn't give the money. Q. You wouldn't do a thing like that? A. Well, I didn't do it then, did I? What would you have done under the circumstances? Q. I don't know. I think I would have given a little advance to De Florez. He seems to be a worthy young man. I think I would have treated him very liberally. A. All right." Whether De Florez, plaintiff's agent and family connection, was a worthy young man or not, he was not called to contradict the very serious charges made against him and inferentially against the agents of a foreign government in the throes of revolution.

Plaintiff's personal service appears to have been two-fold; he introduced the Bradleys to the Savage Arms Company and endeavored to bring about the sale of the plant, although later he is compelled by the exigencies of the situation to say that was a separate service covered by an agreement to pay " compensation for legal services," a " fee " $100,000. If it was a separate service, then his personal part in securing the Russian contract consisted in his relationship and friendship with the legal advisers of the Russian government in this country and his professed ability to put the contract through at all events for that reason. From its inception the whole transaction has an unpleasant and unwholesome appearance. Mr. Fuller says he had never acted as a broker before this extraordinary departure from his legal profession. But in our opinion all this confirms the defendant's claim that the commission of fifty cents per 1,000 cartridges, not forty cents, this commission of $500,000, not $400,000, was to be payable only in the event that the contract was performed and that Bradley actually received the money from the Russian government. It is only this interpretation which will explain such an enormous payment for services of the vaguest possible description. We may well imagine why De Florez demanded $500,000. But plaintiff as a reputable member of the bar cannot justify his claim on any other basis than the plain unequivocal conditions written by himself in his letter of agreement. The defendant's agreement was that " In consideration of the services rendered by you in securing a contract for us with the Imperial Russian Government for the manufacture and sale of One billion (1,000,000,000) cartridges, we agree to pay you, in event of such contract being accepted and executed by us, as full and complete compensation," etc. We think that the meaning of the words " executed by us " is that the contract was to be performed. We think the meaning of the word " executed " does not refer to the mere signing of the contract, and this interpretation is confirmed by the succeeding portions of the contract letters, and the words used are the plaintiff's in preparing the letters. " It is understood that the commission mentioned above shall become due and payable only as and when and in the same proportion

as we receive payment from the purchaser; that is to say the commission is only to be paid out of the payments under the contract." In our opinion, the actual receipt of the cash by Bradley was a condition precedent to plaintiff's right to recover. We may take notice from the course of events across the sea that even if Bradley had undertaken the manufacture of the 1,000,000,000 cartridges, they might never have been delivered, and might never have been paid for by the Imperial Russian government — now a thing of the past. We have referred to some of the unpleasant and unwholesome aspects of this case. We do not dwell here on the peculiar reasons given by plaintiff for splitting up his $500,000 contracts into four payments and obtaining a letter stating that each amount is " full and complete compensation and commission " for his service, except to say that they do not commend themselves ˜to reasonable men. But there is a matter of greater significance connected with these four letters, in their relation to plaintiff's present action to recover $400,000 commissions. It is something which seems to throw light upon the intention of the parties when these contract letters were signed, and which indicates that the plaintiff is entirely aware of its significance. The plaintiff testified, as well as the defendants and all of the witnesses in the case on both sides, that the plaintiff's commission was to be fifty cents per 1,000 cartridges, or $500,000 for the 1,000,000,000 cartridges to be manufactured. No other sum was asked or suggested. At the plaintiff's urgent insistence, on his statement that the legal advisers of the Russian government wished all these matters of commission settled before the contract was signed, and that the letters were necessary to secure the signing by the Russian commissioners, the defendant signed four letters on October 4, 1915, to evidence its agreement to pay this $500,000 commission contract. In each of the first three letters, the full and complete compensation and commission of the plaintiff for procuring the Russian contract was stated to be a different sum, the first letter " ten cents (.10c) per thousand cartridges, amounting on the above order of 1,000,000,000 cartridges to the sum of One hundred thousand dollars ($100,000);" the second letter " thirteen and one-third cents (.13⅓c) per thousand cartridges, amounting on the above

order of 1,000,000,000 cartridges to One hundred and thirty-three thousand three hundred and thirty-three dollars and thirty-three cents ($133,333.33); " the third letter " sixteen and two-thirds cents (.16⅔c) per thousand cartridges, amounting on the above order of 1,000,000,000 cartridges to One hundred and sixty-six thousand six hundred and sixty-six dollars and sixty-six cents ($166,666.66); " this, it will be noted, aggregated $400,000, less one cent. In each of these letters it is stated clearly and unequivocally that the sum named is the " full and complete compensation and commission " of the plaintiff. But the plaintiff was to receive more than $400,000 — his contract called for fifty cents per 1,000 cartridges. No one ever suggested forty cents per 1,000. His commission was to be $500,000, not $400,000, a substantial difference, even in this case of bewildering figures. So the fourth letter was prepared by plaintiff at the same time as the other three, and signed by the defendant at the same time, and delivered to plaintiff with the others. In the fourth letter, instead of stating a new percentage as full compensation and commission for procuring the contract so as to make up the aggregate of $500,000, the defendant in consideration of services rendered by plaintiff in connection with the purchase of the Savage Arms Company, or control of the same, at plaintiff's request, signs a promise to pay " One hundred thousand dollars ($100,000.00) as full and complete compensation for legal services performed by you for us. It is understood that the above mentioned legal fee shall become payable only in event of the deal for the purchase of the Savage Arms Co., or control thereof shall have been completely consummated." Now the case may be searched from beginning to end to find any word of evidence that plaintiff ever asked, or that defendant ever promised to pay $100,000 for services, legal or otherwise, in connection with the purchase of the Savage Arms Company. True, the plaintiff says he was employed to obtain control of that company for defendant, but it was part and parcel of the entire transaction. There is no claim made by plaintiff that he asked or was promised $100,000, or any sum whatever, for this service, separate and apart from his commission of fifty cents per 1,000 cartridges — $500,000. And yet we have this most astonishing

abandonment of $100,000 of the commission which he and every one else agrees was to be paid if the contract was performed and payment made. The explanation is apparent. Because the plaintiff is here asserting his right to $400,000 upon the theory that he was not concerned in the performance of the contract by the Bradleys. He takes the position here that, having brought the parties together, the Imperial Russian government and Bradley on the one hand, and Bradley and the astute gentlemen from Utica representing the Savage Arms Company on the other, his work was done. If the Russian commissioners inserted impossible conditions precedent, still, says the plaintiff, Bradley accepted them; if the officers of the Savage Arms Company representing its stockholders demanded profits which astonished their *cestuis que trust,* and bonuses of $1,200,000 or $1,700,000 for themselves, still Bradley was willing, and plaintiff takes the position that his right to commission was in no way dependent upon performance of the contract or payment made. Of course, the plaintiff, in urging that the Bradleys signed the Russian agreement containing the condition precedent for the purchase of the Savage Arms Company, and that they signed the option with the Savage Arms Company and afterwards declared their intention to execute it, overlooks the obvious fact that he, the plaintiff, brought about these things by his representations that everything would be satisfactory and that the matter would surely go through. When defendant objected to the condition precedent in the Russian contract, it was the plaintiff who represented that with De Florez handling the Russian commissioners, and plaintiff handling the legal advisers of the Russian government, there would be no difficulty in obtaining modifications and concessions which would enable the Bradleys to obtain the necessary advances to pay the amounts demanded by the Savage Arms Company's executive committee. But plaintiff's last letter shows unmistakably that he is wrong in his claim that payment was due him in advance of full performance and receipt of the moneys by defendant. His last letter makes the $100,000 payable only upon the complete consummation of the purchase of the Savage Arms Company. While we think there is no ambiguity in the meaning of the first three letters, and that the language

is to be interpreted in its plain, obvious meaning, that the commissions were not to be paid until the money due for the cartridges was actually received and then out of that money, there is no escape from the last letter. Surely that $100,000 was not payable until the purchase of the control of the Savage Arms Company was completely consummated. We think there can be no question that the money was not due or payable unless the purchase of the control of the Savage Arms Company was an accomplished fact. And it was never an accomplished fact, it was never consummated. And this $100,000 is part and parcel of plaintiff's commissions as fully and completely as the $400,000 sued for here. We are forced to the conclusion that it is deliberately abandoned in this action in the effort to press the claim for the remainder on a theory entirely inconsistent with the plain language of the last letter; a theory at variance with the plain meaning of the language used in the first three letters, at variance with the intention of the parties as disclosed by their relations and transactions in evidence, and, lastly, an erroneous theory flatly contradicted by the last letter. To allow plaintiff to sustain this judgment for $400,000 when the scheme devised by him and in which he took the risk of performance with the defendant failed, where the defendant has not realized one dollar from the transaction despite its best efforts to perform, but, on the contrary, is out of pocket $100,000, would in our opinion be unconscionable and unjust. The whole scheme of letting this $37,500,000 contract to impractical, inexperienced men without machinery or plant, with a condition precedent that they must buy out the company which really had to do the work, is open to the suspicion that it was a plan to loot the treasury of the former Imperial Russian government, made up in large part of cash contributed by the people of the United States of America. We know that the profits were not to go to the defendant without substantial depletion. We can see from the record where nearly $3,000,000 were to go in bonuses and commissions. The court cannot shut its eyes to the situation. As was recently said by the Appellate Division in the First Department of a much milder attack on the Serbian treasury: " The making of such an agreement to rob a people already

impoverished by famine and war discredited all who participated therein." (*May* v. *Hettrick Brothers Co.,* 181 App. Div. 3.) In our opinion, the judgment should be reversed, but we think the case should go back for a new trial, so that the questions of fact, if there be any, may be clearly stated and submitted to the jury for determination.

The judgment and order should be reversed, and a new trial granted, costs to abide the event. This court reverses the verdict and findings of the Trial Term as contrary to the evidence and contrary to law, and particularly the finding of the trial justice so far as the same is involved in the verdict, that it was the intention of the parties that the plaintiff was entitled to payment of commissions upon the signing of the contract between the Imperial Russian government and the defendant, or upon the signing or acceptance of the option on the stock of the Savage Arms Company, and the finding that failure of performance was due to any act or default on the part of defendant.

JENKS, P. J., and PUTNAM, J., concurred; BLACKMAR, J., concurred in result; THOMAS, J., read for affirmance.

THOMAS, J. (dissenting):

Three men, named Bradley, owned the stock of the defendant. In the early summer of 1915 the Bradleys considered the manufacture and sale of munitions to the Russian government. For such purpose they had not plant, facilities, knowledge, expert skill or sufficient usable capital. They were experienced in enterprises of much importance, largely in the direction of construction work, for which they were adequate in knowledge, appliances and resources. But they entered resolutely upon this new enterprise, so foreign to their education and to the charter of the company, later amended for such an undertaking. They had no contract with the Russian government, and plaintiff presented himself as a person able to procure it. He was the son of a partner in the firm of Coudert Brothers, counsel to the Russian commission come to this country to obtain such munitions. Its head was General Sapojnikoff. Mr. Murray of the law firm was in immediate relation to the affairs in question.

The Bradleys were in the negotiations under such advice and safeguard as could be afforded by their engineer, Mr. Hopkins, and their regular lawyers, Mr. Lynch, Mr. Keating, and their counsel, Governor Conway, who had the immediate charge of the transaction in question. An instrument was executed by the Russian commission and defendant under the date of October 15, 1915. The services rendered by plaintiff concerning an expected contract with the Russian government, or matters pertaining to it, were the subject of four letters, each dated October fourth. The plaintiff's entire commission at the stipulated price of ten cents per 1,000 cartridges would be $500,000, but it was separated, as shown by such letters, for purposes not at the moment material. The letters: except as to amounts pertaining to the commissions, are, " In consideration of the services rendered by you in securing a contract for us with the Imperial Russian Government for the manufacture and sale of One billion \* \* \* cartridges, we agree to pay you, in event of such contract being accepted and executed by us, as full and complete compensation and commission ten cents \* \* \* per thousand cartridges, amounting on the above order of 1,000,000,000 cartridges to the sum of \* \* \* dollars. It is understood that the commission mentioned shall become due and payable only as and when and in the same proportion as we receive payment from the purchaser; that is to say the commission is only to be paid out of the payments under the contract." The essential stipulations are: (1) The services have been " rendered " — things past and complete; (2) the contract is something recognized as secured but not " accepted and executed; " (3) the payments are coincident in time and relative proportion with the payments to the company under the contract. At once any argument disappears that plaintiff has or has not earned his commission, but the payment by the terms must await returns to the defendant. It was, then, inevitable for payment to plaintiff and defendant that the contract should be accepted and executed, and that the payments should be received. To such purposes the parties bent their energies. What was the result? The defendant did accept and execute a contract with the Russian government under the date of

October 15, 1915. Was it the contract for securing which defendant agreed to pay plaintiff? The defendant on October nineteenth, four days after the date of the contract, wrote Adriance, Green and Lynch, whom I will call the Adriance syndicate, " we have closed *the* contract between ourselves and the Imperial Russian Government." Why write that? Because the defendant had agreed under date of September 29, 1915, with the syndicate to buy so much of the stock of the Savage Arms Company as would insure its control and the sellers had stipulated upon certain payments made to turn over the control of the Savage Arms Company. In such agreement of September twenty-ninth the parties had stipulated: " If within fifteen (15) days the party of the second part fails to close a deal for cartridges with the Russian Government, negotiations for which are now pending, the parties of the first part agree to extend this option for the further period of fifteen (15) days without additional expense to the party of the second part. Should the party of the second part close a contract for cartridges during the periods aforesaid, it shall immediately notify the parties of the first part in writing of its intention to take up this option and the parties of the first part hereby agree to give the party of the second part fifteen (15) days' time from the service of such notice within which to make the necessary financial arrangements to make the payments provided for herein." Note the terms — if the " party of the second part fails to close a deal for cartridges with the Russian Government," and again — " Should the party of the second part close a contract for cartridges * * * it shall immediately notify the parties of the first part." For such reason the defendant wrote the letter of October nineteenth wherein it said: " We hereby notify you that we have closed the contract between ourselves and the Imperial Russian Government." And yet I hear argument, impossible of truth, that the defendant had not, as regards itself and this plaintiff, closed a contract with the Russian government. There was no other contract pending. The defendant for some time, in association with plaintiff, had been in negotiation with the Russian agents. There had been proposals and counter-proposals, and when the defendant wrote the letters to the plaintiff the

terms of the Russian contract had been formulated, and there was left to the defendant the option to take or to reject it. The defendant accepted, and executed it.. There was, then, a consummation that left two things established: (1) Full performance by plaintiff; (2) the actual acquisition of the contract. There was still something that stood between plaintiff and the receipt of his commissions, to wit, the receipt of them by the defendant. But the proposition is advanced that the defendant at its pleasure or convenience could avoid receiving payments to it, and thereby defeat payment to the plaintiff. Let the result be considered from two views: (1) Willful refusal of the defendant to proceed; (2) financial inability to proceed. The broad proposition adverse to plaintiff is that the whole matter was one of a ʾjoint adventure, and that the defendant was at liberty at any juncture before or after the execution of the contract to toss it aside in total disregard of plaintiff's procurement of it, and defendant's promise found in the words, " we agree to pay you." All plaintiff's labor, then, and the enterprise itself, was at the peril of defendant's humor or disposition — something with which it could trifle lightly and with no consideration and unconstrained, as if there had been added to its written promise, " the plaintiff assumes the chance that defendant may at any time, and at any stage of the contract or manufacture under it, fitfully refuse to concern itself with it." I turn from such suggestion to a juster subject of discussion, viz., could defendant, after the execution of the contract, refuse to proceed upon the plea of financial inability without breach of legal duty to the plaintiff. If the answer be in the affirmative, it adds to the contract this term: " The plaintiff assumes the risk of the defendant's financial ability to fulfill the contract after its acceptance and execution and thereby earn the moneys out of which plaintiff's commission is payable." I deem such conception inconsistent with usual legal obligations of the kind here involved. The plaintiff did ass me many hazards — so varied in fair consideration of the undertaking that they are beyond present enumeration or perchance conception. But it is not rational argument that, if the enterprise had not failed through defendant's default,· it might have been wrecked by other dangers that

would be related to it.   The imagination may conjure baffling and destructive agencies, but the record reveals a single cause — the failure of the defendant to provide the money to go forward whereby would accrue the fund from which plaintiff's commission was payable.   The law regards the fault that is, and not one of many that might have been.   That fault put an end to the enterprise, and hence no others could act upon it.   It was the defendant's peculiar province to measure its resources against the demands of the project.   It represented to the Russian commission that it had " liquid assets of a little over $8,000,000," and in addition that the three Bradleys had individual assets aggregating $4,625,000, " altogether a total of $12,625,000 net liquid assets after all bills are paid," and, as later indicated, the conditions of the Russian contract were not met for failure to raise $4,284,000, plus some interest, whereof $800,000 was to be evidenced by notes running through periods not exceeding ninety days. There were other capacities and resources which the defendant represented itself as possessing.   And yet it did not fulfill the conditions of the Russian contract, either because it had the means but would not use them, or because its ability to make them available was insufficient, or because it had not the means, and the proposition is that the plaintiff took the chance of the failure, whatever the cause.   One valuable thing presumably possessed by the defendant was capital.   It could and did point to that as something dependable and for which it could vouch.   And yet any and all infirmity in that regard must be at plaintiff's risk — so the argument runs.   If a broker agree that he shall not be paid a commission until his principal receives a deed of land or the consideration money, and either fail because the principal has not the land to convey or the money to pay, whichever be his stipulated obligation, the broker does not take the risk.   The broker is not deemed to know the contents of the principal's pocket, or if it be represented as $12,625,000 net, the broker does not hazard the degree of its purchasing power or the principal's skill in administration.   The defendant's task was to adjust its potentiality in finance and property to the demands of the enterprise, and to accept or to reject available terms according to its judgment.   The plaintiff was not in position to weigh

defendant's money might beyond the exposure made, or to question the judgment it should exercise. Every man is free to determine the degree of his achievement. He may say to his broker, " When the property, which you procure me the right to buy, shall come to me, payment shall come to you," but when the right is procured for the principal, he may not say that he will not, or cannot, pay for it, and so prevent the happening of the event on which the broker's payment depends. In my judgment, the sole question is — was the Russian contract that which was contemplated by the agreement with plaintiff, and did it fail because defendant could not or would not expend the money to make it effective? The contract provided: " This contract shall not become effective until the Manufacturer (a) has acquired the plant of the Savage Arms Company, control of its Board of Directors and of all of its executive officers.   (b) has secured the services of experts who thoroughly understand and are experienced in the manufacture of cartridges.   (c) shall have made contracts for the raw materials necessary for the manufacture of the cartridges and also contracts for machinery and structures to effect a substantial enlargement of the plant of the Savage Arms Company * * *.   (d) has delivered bond hereinabove referred to for Two million * * * Dollars, and has submitted proof of the facts in ' a,' ' b ' and ' c ' hereof to the Purchaser." The manufacturer had stipulated " to manufacture, sell and deliver, and the Purchaser to buy and take one billion * * * cartridges, upon the following terms and conditions." But such term of the contract, like the others, was not effective until the conditions were performed. The defendant did not agree with the Russian government to perform the conditions. Even its attempted performance must be proved to the Russian government. Without complying with the conditions no cartridges could be delivered under such contract, and no money could be received by defendant out of which plaintiff could be paid. The contract not unconditionally effective was not, at the stage of its execution, the fruitful thing the agreement with plaintiff contemplated, because there could not issue from it the fund out of which plaintiff was to be paid. But it was the contract

consequent on the plaintiff's and defendant's long and continued concerted striving; it was the one that defendant accepted and executed, and above all it was the one that defendant could consummate to bind the Russian government and thereby become the productive arrangement the plaintiff and defendant had forecast. In the negotiation plaintiff and defendant had foreknown the conditions as inevitable, and had put forth efficient efforts to make provision for fulfilling them. It appears that the Bradleys were prepared to perform the last three conditions, and so attention may be confined to the acquisition of the control of the Savage Arms Company in the manner and to the extent required. That was not achieved, although the parties through considerable time and varied and extensive activities tried to realize it. What was done and what caused the failure in that regard? I have noted that before the contract of October fifteenth with the Russian government, and in anticipation of its requirements, and under the date of September 29, 1915, the defendant agreed with three persons, Adriance, Green and J. De Peyster Lynch, to buy at least 6,400 shares of the stock of the Savage Arms Company at the price of $380 per share, " the same to be payable as soon as the said assignment and the stock so assigned shall be properly executed and delivered to the said party of the second part." The defendant agreed to pay $100,000 upon the purchase price to be forfeited as liquidated damages if the Bradleys failed to pay the balance on October 14, 1915, or at the date as extended, for which provision was made. A further consideration of the sale was that the Bradleys should pay the vendors $1,700,000 " upon the parties of the first part delivering to the party of the second part their written * * * agreement not to engage in the manufacture or sale of firearms or ammunition " within the United States for a period described. The agreement shows its interrelation to the Russian contract expected but not at the time acquired. I will not repeat the quotation in that regard already given. The faculties of both plaintiff and defendant were devoted to carrying the two agreements to consummation, letting, however, the Savage Arms contract wait upon the execution of the Russian contract, and after that agreement had been

executed they continued to supplement it and perfect it by gaining needed control of the Savage Arms Company. There remained nothing for defendant to do, save to meet the Adriance syndicate, pay the money agreed to be paid by the contract with it, and the Savage Arms Company would be in defendant's control, and the condition in the Russian contract would become performable. The defendant and the Adriance syndicate met to perform, and there were adjournments and postponements, but the defendant did not do as it had agreed. It would be simply diverting from essentials to consider the varied contentions that attended the progress of the attempted fulfillment of the contract of September twenty-ninth, and the amendment of it, to which I shall refer. The Bradleys initially contended that they should have the 6,400 shares of stock upon paying the Adriance syndicate $360,000, and giving the company's notes indorsed by the Bradleys individually for the balance of the sum it had agreed to pay. The whole principal sum to be paid was some $4,288,000, less, may be, the $100,000 that had been advanced. The defendant not only demanded such credit, but insisted upon the concurrent transfer to it of the control of the directorate of the Savage Arms Company, and the investment of the Bradley interest in its executive officers. There was nothing in the agreement that suggested or tolerated such demand. The Bradleys based it upon the contention that there had been an oral option that promised it to them, and that the same was considered as a part of the written agreement, but was not written in it because Governor Conway at the suggestion of Adriance, or otherwise, did not deem it necessary. However, disregarding the improbability that the Adriance syndicate would turn over its company upon so slight payment and credit, the fact remains that no intimation of it appears in the written contract, but rather its language is concise and plain that the stock was to be paid for on proper assignment and delivery, and the $1,700,000 to the syndicate upon its performance. The contract with the Russian government proposed the deposit of several millions of dollars to meet the payments for ammunition furnished by the Bradleys, and it was defendant's plan that, after paying ten per cent to the syndicate, it would give notes

which, with renewals, could be met from such deposit as payments became due therefrom. There is nothing whatever in the agreement of September twenty-ninth to justify such proposition, and it should be rejected. However, after much discussion, on October twenty-seventh the Bradleys agreed to increase the amount that should be paid in cash to the sum of $1,043,000, and they proffered a certified check for that amount. Their contention is that upon meeting the syndicate, the latter in the forenoon agreed to accept such cash, but after lunch rejected it. The chief difficulty, as it seems, was not so much the immediate sufficiency of that amount as the surrender of the directorate of the company and its executive officers to the Bradleys. After discussion and difference of opinion, it was concluded that the sufficiency of mere stock control should be submitted to the Russian commission, which, however, continued to require actual control of the company through its directors and officers. I do not delay to inquire whether the oral agreement did provide for a payment of ten per cent in cash with credit so extended for the balance. Frank Bradley, William Bradley, Lynch, the attorney, and Hopkins, the engineer, so testified, but the memorandum under date of September 15, 1915, made by Adriance at the time and copied by Bradley, does not so state, and it is denied by Adriance, Lynch and Green. If it were necessary to decide the question, the implied finding of the court favorably to the plaintiff should be sustained. But the unambiguous provision in the contract forecloses discussion. But whatever the merit of the contentions of the parties when they met on October twenty-seventh to close the contract of September twenty-ninth, all was composed by the contract of October thirtieth, where it was explicitly determined what should be done, viz., pay $800,000 in cash and for the balance of the $4,284,000 give notes, with an extension of time for closing, which was arranged for November twelfth and later extended to November seventeenth, on which day the Bradley Company did not fulfill, and had no legal excuse for their default. What, then, was the situation? The defendant had the Russian contract for which it and the plaintiff had been working. It was the contract to which the plaintiff and defendant referred in their

contract, and that to which reference was had in the agreement of September twenty-ninth between defendant and Adriance and others. To make it effective, the performance of conditions was necessary — but such performance was to be made solely by defendant. Hence, it had the sole right to make an ineffective contract effective, to give it a perfection and life indisputable by the Russian government. The defendant knew what the conditions would be. It agreed to accept a contract containing them. It had secured all rights necessary to perform them. It had a contract that would bring the Savage Arms Company within the condition. It notified the other party to that contract that it was ready and demanded performance. Nothing stood in its way save the payment of what it had agreed to pay. All was within its command and subject to its dictation. But it opened its hand and let go the whole sum of its acquisitions, because it would not or could not pay what it had promised to pay. The feature of the case on which thought concentrates is the acquisition not only of the Russian contract, but the means of satisfying its exactions. Then defendant proclaimed its financial inability or indisposition, and let the whole system of agreements disappear. The enterprise did not fail because the defendant had not a contract with the Russian government which it was legally enabled to fulfill, but because financial apprehension, prudence or necessity prompted or constrained it to fail in its agreements. So the whole matter comes back to the inquiry whether the plaintiff assumed the risk of misadventure from such cause. I cannot conceive that the parties to the agreement left the obligation of it to the whim of the capitalist, as if promises were the mere sport of vagaries, or that the defendant could, on a plea of poverty or frugality, let slip the thing secured and thereby defeat the commission of the procuring agent.

I conclude that the judgment should be affirmed, with costs.

Judgment and order reversed and new trial granted, costs to abide the event. This court reverses the verdict and findings of the Trial Term as contrary to the evidence and contrary to law, and particularly the finding of the trial justice so far

as the same is involved in the verdict, that it was the intention of the parties that the plaintiff was entitled to payment of commissions upon the signing of the contract between the Imperial Russian government and the defendant, or upon the signing of acceptance of the option on the stock of the Savage Arms Company, and the finding that failure of performance was due to any act or default on the part of the defendant.