## SEGAL BROKERAGE CO., Inc., v. LLOYD L. HUGHES, Inc.

### No. 8643.

[Circuit Court of Appeals, Ninth Circuit.

April 13, 1938.

D. V. Morthland and Lane Morthland, both of Yakima, Wash, for appellant.

Cheney & Hutcheson, Joseph C. Cheney, and Elwood Hutcheson, all of Yakima, Wash., for appellee.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appeal is from an order of the District Court approving the report of a special master rejecting claims of appellant for administrative expenses against appellee Lloyd L. Hughes, Inc., in proceedings for reorganization under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207 and note.

The petition for allowance set up two claims. One of these was based upon commissions said to have been earned by ap-

pellant under a brokerage contract for the sale of hops. The other claim is for the reasonable value of services alleged to have been rendered in negotiating a settlement between appellee and the E. B. Hittleman Brewery, a concern which appellant had procured as purchaser of the hops. For convenience appellant will be referred to as Segal, the appellee as Hughes, and the purchaser as Hittleman.

Segal's petition alleges that on May 19, 1933, he entered into a written agreement with Hughes whereby he was appointed exclusive sales agent for Hughes in an eastern territory for a period of five years. Pursuant to this agreement, Segal negotiated several contracts with Hittleman for the sale of hops to be grown during the years 1934 to 1937, inclusive. Hittleman failed to perform these contracts; and Segal was requested to assist in negotiations "relative to the said contracts and deliveries under the terms thereof," and his assistance resulted in the execution of a note by Hittleman to Hughes and the extension of time for the delivery of the 1934 crop.

It is alleged that in the spring of 1935 Hughes filed a petition for reorganization under the Bankruptcy Act, and thereafter reached a settlement with Hittleman whereby the latter paid the sum of $38,000 in full satisfaction of all claims arising out of his defaulted contracts to purchase. The petition claims commissions in the amount of approximately $13,000, based upon the brokerage contract. There is an alternative count in quantum meruit.

The second claim set up in the petition is for services alleged to have been rendered at the request of Hughes in the negotiations leading to the settlement. The reasonable value of these services is claimed to be $2,000.

The special master, to whom the claims were referred, found that Hittleman was unable to perform his contracts of purchase because of financial difficulties, and that he defaulted also in the payment of the note given by him to Hughes, representing advances which he had undertaken to make. The negotiations carried on by Segal were found to have been in connection with efforts to obtain new contracts with Hittleman concerning the sale of the hops; but these efforts were unsuccessful. It was further found that Hughes commenced two suits against Hittleman, one for the collection of the note and the other for damages for the breach of the contracts, and that in August, 1935, a settlement was made whereby Hughes was paid $38,000 in full satisfaction of all claims.[1]

The master found that Segal took no part in the settlement and conducted none of the negotiations leading up to it. He concluded that Segal was not entitled to anything, and his findings and report were approved by the trial court.

The brokerage contract between Hughes and Segal (providing a commission of one cent per pound for hops sold) contained the following provision:

"8. The brokerage of the agent to be computed on the amount of each invoice Further brokerage will be deemed to be earned on acceptance and payment of each order or installment of each order. It is further mutually understood and agreed that *in the event of any default on the delivery or payment, no brokerage will be deemed to be earned on such defaulted installment or defaulted sale.*" (Italics supplied.)

The finding below, based on conclusive evidence, is that no deliveries were made under the Hittleman contracts for the reason that Hittleman was unable to pay for the hops he had agreed to purchase from Hughes. Appellant does not contend that there was an actual performance of the contracts. His contention seems to be that the settlement with Hittleman was the substantial equivalent of performance, and that therefore he was entitled to his brokerage commissions. He cites cases for the proposition that a broker may, under certain circumstances, be entitled to his commissions even though the contract between the principal and the customer is not carried out.[2]

■■ The general rule is that, in the absence of special contract, a broker is entitled to his commissions when he has produced a customer who is ready, able, and willing to accept the terms offered by the

---

[1] It appears from the evidence that Hittleman had made an advance payment of $13,000, and that in the settlement Hughes retained this amount and was paid $25,000 additional.

[2] Dermody v. New Jersey Realties, Inc., 101 N.J.L. 334, 128 A. 265; Bru-

ner-Goodhue-Cooke-Cranz Agency Co. v. Smith, 25 Ohio App. 21, 157 N.E. 407; Lesser v. McGerry & Co., Inc., 121 Cal. App. 193, 8 P.2d 1058; Kendrick v. Speck, 4 Cir., 67 F.2d 295; Peak v. Jurgens, 5 Cal.App.2d 573, 43 P.2d 569. We think these cases are distinguishable.

principal. 8 Am.Jur. 1090. But it is equally well settled that the broker is not entitled to commissions, where, by the terms of the brokerage contract, their payment is made to depend upon conditions precedent which have not been performed, as, for example, upon the success of the agreement of sale, Lassen v. Bayliss, 3 Cir., 125 F. 744; upon payment of the purchase price, Lewis v. Briggs, 81 Ark. 96, 98 S.W. 683; or upon the passing of title, Duffy & Thomas, Inc. v. Miller, 135 A. 500, 5 N.J.Misc. 77. See Restatement of the Law of Agency, vol. 2, p. 1040; and for further authorities in this connection, 51 A.L.R. at page 1399.

Where the obligation of the principal to pay commissions depends upon the performance of conditions precedent, the broker takes the risk of nonperformance on the part of the customer. As said in Fuller. v. Bradley Contracting Co., 183 App.Div. 6, 170 N.Y.S. 320, 328, "a broker may bind himself not to demand payment unless the contract is actually 'carried out. * * * Such agreements are lawful and proper, and not unusual."

A short answer to Segal's contention is that the amount paid in settlement by Hittleman was not shown to have been the substantial equivalent of the profits Hughes would have made had the contracts been performed. Hughes had himself entered into numerous contracts with growers for the purchase of hops in reliance on Hittleman's engagements. The market price of that commodity underwent a drastic decline, and Hittleman's default resulted in heavy potential losses which forced Hughes to resort to reorganization proceedings under the act.

However, even though the sum paid by Hittleman had been such as fully to recompense Hughes for the breach of the contracts, the authorities indicate that Segal still would not be entitled to commissions. This is unquestionably the rule in New York. R. J. Caldwell Co. v. Connecticut Mills Co., 225 App.Div. 270, 232 N.Y.S. 625. See, also, Spero v. Kobler, 245 App.Div. 643, 283 N.Y.S. 791. And it would seem to be the rule in Washington. Sams v. Olympia Holding Co., 153 Wash. 254, 279 P. 575. Segal's contract is governed by the law of one or the other of these two states.

A careful perusal of the record discloses that the only services performed by Segal were in connection with efforts to make deliveries of the hops under the original contracts, or in lieu of that to make new contracts with Hittleman for a less price and for deliveries over a longer period of time. These activities were admittedly a part of his job under his agency contract, and he pursued them in an obvious attempt to complete the sales and thus earn his commissions. Since his efforts were unavailing he earned no commissions.

Hughes' proceeding under the Bankruptcy Act was initiated March 9, 1935. There is no persuasive evidence that subsequent to that time Segal performed any services of an administrative character, or that he had anything to do with the settlement which was ultimately made between Hughes and Hittleman.

The findings of the special master are fully supported by the evidence, and the order is affirmed.