699 F.2d 952
 MISSOURI-INDIANA INVESTMENT GROUP, a Missouri limited
partnership, Appellant,
v.
Obie SHAW and Gene Silkey, d/b/a Management of Energy
Resources, an Indiana partnership, Appellees.
 No. 81-1788.
 United States Court of Appeals,
Eighth Circuit.
 Argued June 14, 1982.
Decided Feb. 9, 1983.
 
 Gallop, Johnson & Neuman, Edwin D. Akers, Jr., St. Louis, Mo., for appellees.
 London, Greenberg & Fleming, Lawrence J. Fleming, St. Louis, Mo., for appellant.
 Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and FAIRCHILD,* Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 This action was begun in a Missouri court and removed by defendants on the basis of diversity jurisdiction.
 
 
 2
 Plaintiff Missouri-Indiana Investment Group (Missouri-Indiana) is a limited partnership consisting of Robert E. Smith, general partner, and 13 limited partners. Named defendants are "Obie Shaw and Gene Silkey, d/b/a Management of Energy Resources, an Indiana Partnership." The latter partnership is referred to in this opinion as MER. The district court found that Smith was also a partner in MER.[1]
 
 
 3
 On April 8, 1978, a Sale and Leaseback Agreement was executed by MER and Missouri-Indiana. By its terms: MER assigned its interest in coal mining leases in Fountain County, Indiana, to Missouri-Indiana. Missouri-Indiana agreed to pay $100,000 immediately and another $100,000 within 30 days. Missouri-Indiana assigned the leases back to MER. MER agreed to mine coal and pay a royalty per ton to Missouri-Indiana. MER guaranteed to mine 10,000 tons per month and a minimum of 800,000 tons.[2] The royalty rate was $4.00 per ton, with an increase to $5.00 per ton if Missouri-Indiana paid a third $100,000, which Missouri-Indiana did. Shaw and Silkey signed the agreement on behalf of MER and also as guarantors.
 
 
 4
 This lawsuit resulted when little coal was mined and no royalties paid.
 
 
 5
 There was a bench trial. At the close of plaintiff's evidence, the judge granted defendants' motion for judgment and made findings and conclusions, awarding judgment to defendants. Missouri-Indiana Investment Group v. Shaw, 518 F.Supp. 576 (E.D.Mo.1981). His principal conclusions were that there could be no recovery under the contract because an agreed condition had not been fulfilled and that in any event plaintiff and defendants were joint venturers. Plaintiff appealed. Most of the significant facts are set forth in the district court decision.
 
 
 6
 I. The Contingency Provision of the Agreement
 
 
 7
 Paragraph 13 of the Sale and Leaseback Agreement reads, "This Agreement is contingent on MER executing a contract with the present owner of the mine and equipment, (Mr. Robert Tatge or one or more corporations owned by him) which contract must be in a form acceptable to Missouri-Indiana." The district court concluded that full performance by Tatge was a condition precedent, and that Tatge's default in assigning mining rights and turning over equipment discharged defendants' contractual duties. We disagree.
 
 
 8
 The district court cited Ennis v. Ring, 49 Wash.2d 284, 300 P.2d 773, 776 (1956), as its only authority for the proposition that to "execute a contract" means to enter into a contract in which nothing remains to be done by either party. Ennis applied that definition to a rule exempting executed contracts from the statute of frauds. Although the Supreme Court of Missouri has defined an "executed contract" as one where nothing remains to be done, it did so in distinguishing an executed from an executory contract. Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 S.W.2d 9, 17 (1932). In other contexts the Missouri court has equated execution of a contract with signing and delivery. Meredith v. Brock, 322 Mo. 869, 17 S.W.2d 345 (1929); Hart v. Harrison Wire Co., 91 Mo. 414, 4 S.W. 123, 126 (1887). See Coen v. American Surety Co., 120 F.2d 393, 397 (8th Cir.), cert. denied, 314 U.S. 667, 62 S.Ct. 128, 86 L.Ed. 534 (1941).
 
 
 9
 Whatever the range of definitions of the verb "to execute," Missouri cases recognize that in popular speech, "execute" is often used to refer merely to the act of signing a written contract. Morris v. Butler, 138 Mo.App. 378, 122 S.W. 377, 378 (1909).
 
 
 10
 Paragraph 13 states that the contract between MER and Tatge must be in a form acceptable to the plaintiff. We think that this reference to form indicates that the contingency would be fulfilled upon the signing of an approved written contract. Paragraph 12 refers to the agreement between the plaintiff and MER as "being executed in Missouri in counterpart originals." In paragraph 12 "executed" means "signed" and this use is a reason for giving a parallel meaning to "executing" in paragraph 13.
 
 
 11
 The Sale and Leaseback Agreement purported to constitute an immediate assignment and assignment back of leases held by Tatge. It also imposed an obligation on Missouri-Indiana to pay $100,000 immediately, by check payable to MER and Tatge, evidently to purchase Tatge's leases. MER had an obligation to start mining in seven (7) days. It would seem that the parties must have contemplated the contingency would fail or be fulfilled almost simultaneously with the formation of the Sale and Leaseback Agreement, so that if it failed, the parties could still have restored each other to their original positions. In fact, Tatge and his lawyer appeared with a proposed contract on April 8, when the Sale and Leaseback Agreement was signed. Attorney Edward Cody and Smith insisted on further information. The signing and approval of the Tatge contract was postponed, and took place on April 11.
 
 
 12
 Plaintiff paid the full $300,000. This fact itself indicates that the parties considered the contingency fulfilled. A construction under which Tatge's later default would subject plaintiff to a $300,000 loss and relieve defendants of all obligation seems most unreasonable.
 
 
 13
 We conclude that no circumstances warrant a construction of the contingency clause different from its ordinary meaning. The Sale and Leaseback Agreement left the burden on defendants to protect themselves from a breach of contract by Tatge.
 
 
 14
 Accordingly, the signing of the contract between MER and Tatge fulfilled the contingency.[3] Tatge's breach thereof did not provide a defense to defendants.
 
 II. Joint Venture
 
 15
 In this action, Missouri-Indiana, the plaintiff partnership, claimed its rights under the Sale and Leaseback Agreement. Having paid the money called for by the Agreement,[4] plaintiff sought to recover from Shaw and Silkey for their default in mining coal and paying royalties as agreed. In denying recovery, the district court concluded that because of the control of the venture exercised by Smith and shared with Shaw and Silkey, the Agreement is not to be taken at face value, but plaintiff is to be treated as engaging in a joint venture. 518 F.Supp. at 581. Presumably the court considered that Tatge's defaults and any other difficulties which prevented success were a shared risk.
 
 
 16
 There is indeed evidence that Smith became a partner in MER with Shaw and Silkey on the same day the Sale and Leaseback Agreement was signed. The district court so found, and the finding is not clearly erroneous. The partnership agreement was kept secret, even from Cody, the attorney for Smith and for Missouri-Indiana (and for Shaw and Silkey as the court found).
 
 
 17
 There is other evidence of Smith's participation in the affairs of MER, although some of this activity is consistent with his role of protecting the interests of Missouri-Indiana as its general partner. To the extent his participation was confined to protecting Missouri-Indiana's rights it was not inconsistent with a lessor-lessee contract relationship.
 
 
 18
 But there is also evidence of his obtaining funds from MER accounts, and using them for his personal benefit.
 
 
 19
 The district court's view that Missouri-Indiana was in a joint venture with Shaw and Silkey must rest on ascribing to Missouri-Indiana Smith's role as partner of MER and such matters as his use of MER's funds. Under the circumstances these involved a conflict of interest between Smith and Missouri-Indiana, and there is no basis for ascribing them to the plaintiff partnership.
 
 A. Collateral Estoppel
 
 20
 The plaintiff suggests that the district court erred by not applying collateral estoppel to hold that Smith was not a partner in MER for purposes of the Fountain County coal mining project. On July 17, 1978, Tatge had brought an action in an Indiana court against Smith, Silkey, and Shaw, doing business as MER, to replevy certain mining equipment and to enjoin defendants from mining on the Fountain County property. There was evidence that the Indiana court dismissed the action as to Smith on the agreement of the parties that Smith was not a member of the MER partnership. Plaintiff asserts that Shaw and Silkey are collaterally estopped from claiming that Smith is a partner.
 
 
 21
 The district court stated three reasons for rejecting this argument: (1) the Indiana Circuit Court never rendered a final judgment in the cause in question; (2) agreements by parties do not give rise to estoppel; and (3) the copies of a docket sheet introduced by the plaintiff were insufficient evidence of the action taken or findings made by the Indiana court. 518 F.Supp. at 581.
 
 
 22
 Court of appeals decisions disagree over whether the forum or the rendering state's law determines the preclusive effect of a state judgment in a subsequent diversity suit. Compare, e.g., Kuehn v. Garcia, 608 F.2d 1143, 1147 (8th Cir.1979), cert. denied, 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980) and Reimer v. Smith, 663 F.2d 1316, 1325 (5th Cir.1981) (forum state) with E.D. Systems Corp. v. Southwestern Bell Telephone Co., 674 F.2d 453, 457 (5th Cir.1982) (rendering state). We need not address this discord because Missouri gives a sister state judgment the preclusive effect it has in the rendering state. Destrehan v. Scudder, 11 Mo. 484 (1848). We therefore look to Indiana law to determine the preclusive effect of the judgment in question.
 
 
 23
 The Indiana courts have not recently addressed the question, but their reported decisions indicate that judgments entered by agreement have the same collateral estoppel consequences as those rendered after a trial. Lemmon v. Osborn, 153 Ind. 172, 177, 54 N.E. 1058 (1899); Mannix v. State ex rel. Mitchell, 115 Ind. 245, 251, 17 N.E. 565 (1888); Rosenmeier v. Krauss, 118 Ind.App. 57, 65, 75 N.E.2d 798 (1947); Burrell v. Jean, 132 N.E. 704, 706 (Ind.App.1921), reversed on other grounds, 196 Ind. 187, 146 N.E. 754 (1925). See Burrell v. Jean, 196 Ind. 187, 204-06, 146 N.E. 754 (1925); State v. Huebner, 230 Ind. 461, 468, 104 N.E.2d 385 (1952). Contra Restatement (Second) of Judgments Sec. 27 comment e (1980).[5]
 
 
 24
 There may be some question whether the dismissal ever reached a state of finality which would give rise to collateral estoppel in Indiana. In any event, however, Indiana courts have held that a prior judgment determining an issue in favor of one or more defendants does not collaterally estop relitigation of the issue between the codefendants. Whitesell v. Strickler, 167 Ind. 602, 615-17, 78 N.E. 845 (1906); Clements v. Davis, 155 Ind. 624, 631-32, 57 N.E. 905 (1900); Finley v. Cathcart, 149 Ind. 470, 478, 48 N.E. 586 (1897); Jones v. Vert, 121 Ind. 140, 142, 22 N.E. 882 (1889); Mossman Yarnelle Co. v. Fee, 75 Ind.App. 601, 607, 131 N.E. 59 (1921). Some jurisdictions have retreated from this doctrine. See Oldham v. Pritchett, 599 F.2d 274 (8th Cir.1979); Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co., 416 F.2d 707, 710 (7th Cir.1969); Schwartz v. Public Administrator, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725, 729 (1969); Restatement (Second) of Judgments Sec. 38. But we are not aware of any Indiana decision to that effect.
 
 
 25
 We also believe that even if Indiana were to modify its co-party rule, it would not preclude redetermination of an issue when the prior proceeding did not present a fair opportunity and an appropriate incentive to litigate the issue. See Bowen v. United States, 570 F.2d 1311, 1322-23 (7th Cir.1978) (applying Indiana law). Such a rule would allow inquiry into whether Smith was a partner in MER. First, Tatge apparently did not request damages. The dismissal of Smith, therefore, would have made the replevin or injunctive relief, if granted, no more or less onerous to the remaining defendants, who therefore had no incentive to litigate the issue. See Restatement (Second) of Judgments Sec. 28. Furthermore, in Tatge's Indiana action the same attorney, Cody, represented all the codefendants. Robert Williams also represented Shaw and Silkey. Williams was paid, at least in part, by Cody and Smith. (Supp. Tr. 101.) Thus Shaw and Silkey may not have had a fair opportunity to litigate the issue.
 
 
 26
 We conclude that collateral estoppel did not prevent determination of the issue in this action.
 
 
 27
 B. The Relationships Between Smith, Cody, Shaw, Silkey, MER,
 
 
 28
 and Missouri-Indiana
 
 
 29
 The finding that Smith was a partner in MER was not clearly erroneous.[6] On April 8, 1978, Smith, Shaw, and Silkey signed an agreement creating a partnership named Management of Energy Resources. The agreement stated, "This partnership is formed for the purpose of bidding on and operating coal lands, and installing and operating a tipple in the Dubois, Indiana area, and any other ventures agreed to by all partners." This provision did not preclude the partnership from extending to the Fountain County operations. Smith asserted that he was not a partner in MER for that purpose. But the evidence revealed that Smith did not treat the Dubois tipple and the Fountain County enterprise as operated by distinct entities. For example, Smith accepted $5,000 from an account established pursuant to an agreement between Missouri-Indiana and MER relating to the Fountain County deal (Tr. 141-42) as repayment of a loan he had made to MER for the Dubois tipple. (Tr. 223.)
 
 
 30
 Both parties agree that Cody has represented Smith since about 1960 and Missouri-Indiana since its formation. The record supports the court's determination that from the inception of the Sale and Leaseback Agreement until the end of 1978, Cody also represented and advised Silkey and Shaw. 518 F.Supp. at 579 (Finding of Fact 10).
 
 
 31
 We agree with the district court that "Joint ventures arise from contractual relations, but may be established without specific formal agreement and may be implied or proved by facts and circumstances." 518 F.Supp. at 581 (citing Pigg v. Bridges, 352 S.W.2d 28, 33 (Mo.1961)). We also acknowledge that "The acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary." Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562, 583 (1931).
 
 
 32
 Missouri courts have applied the concept of joint venture as a device for doing substantial justice. Fish v. Fish, 307 S.W.2d 46, 52-53 (Mo.App.1957). Nevertheless, joint venture can exist only by voluntary agreement. Commerford v. Kreitler, 462 S.W.2d 726, 735 (Mo.1971); Labor Discount Center, Inc. v. State Bank & Trust Co., 526 S.W.2d 407, 424 (Mo.App.1975). Where infancy, fraud, or other legal impediment negates a contractual agreement a joint venture cannot exist. See Bell v. Green, 423 S.W.2d 724, 731 (Mo.1968) (infancy). "The existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint venture by implication." Jeff-Cole Quarries, Inc. v. Bell, 454 S.W.2d 5, 16 (Mo.1970).
 
 
 33
 With these principles in mind, we have examined the record. Cody and Smith were the only witnesses to testify. There was also documentary evidence.
 
 
 34
 It appears that Smith and Cody met Silkey and Shaw in December, 1977 or January, 1978. From then until early 1979 there were numerous meetings and communications. Some related to the Fountain County project and the difficulties it encountered. Some related to other projects. A recitation of the details would unduly lengthen this opinion. Much of what Smith and Cody said was consistent with protection of the interest of Missouri-Indiana in the performance of the Sale and Leaseback Agreement. That Agreement was the only express contract concerning the relationship between Missouri-Indiana and Silkey and Shaw (or MER).
 
 
 35
 The secrecy and other circumstances of the Smith membership in MER indicate that he was acting for his individual benefit in that respect. A partner in one partnership entering into a second partnership does not make the co-partners in the first partnership members of the second, Johnston v. Winn, 105 S.W.2d 398 (Tex.Civ.App.1937); 68 C.J.S. Partnership Sec. 8 (1950), or the first partnership a joint venturer with the second. Although Smith as the general partner may have had the power to consent for Missouri-Indiana, Mo.Rev.Stat. Sec. 359.090; Unif. Limited Partnership Act (1916) Sec. 9, there is no evidence that he exercised that power to create a joint venture between Missouri-Indiana and MER or that MER, Shaw, or Silkey agreed to participate in such a venture.[7]
 
 
 36
 Surely Smith's conduct in his individual interest, conflicting with that of the partnership, provides no foundation for finding a joint venture between the partnership and the defendants.
 
 
 37
 Construing the record in the light most consistent with the district court finding, it nevertheless does not support the conclusion that Missouri-Indiana as a partnership was a joint venturer with MER.
 
 
 38
 Accordingly, we deem it error to have decided in favor of Shaw and Silkey and against plaintiff partnership. Of course defendants' case has not yet been presented. It may well develop that Smith's role vis-a-vis Shaw and Silkey would create a partial defense or offset in favor of the latter, limiting plaintiff's recovery, but the present record provides no basis for disregarding the interests, reflected by plaintiff partnership, of the 13 limited partners who furnished 91% of the funds.
 
 
 39
 The judgment appealed from is vacated, and the cause is remanded for further proceedings.[8]
 
 
 
 *
 Thomas E. Fairchild, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 The findings of fact contain three references to MER as a defendant. Missouri-Indiana Investment Group v. Shaw, 518 F.Supp. 576, 577-80 (E.D.Mo.1981) (Findings of Fact 1, 6, & 14). The conclusions of law contain one such reference. 518 F.Supp. at 580. We do not understand that by these causal references the district court intended to indicate that MER, the partnership, was the defendant. Rather, it seems to us that the district court adopted the plaintiff's practice of referring to Shaw and Silkey collectively as "MER."
 We note that Missouri courts have dismissed suits brought solely in a partnership name, Allgeier, Martin and Associates v. Ashmore, 508 S.W.2d 524 (Mo.App.1974), or against a partnership as such, Tiffany Industries, Inc. v. Harbor Insurance Co., 536 F.Supp. 432, 434 (W.D.Mo.1982); Davison v. Farr, 273 S.W.2d 500, 502-03 (Mo.App.1954). Under Fed.R.Civ.P. 17(b) in this litigation Missouri law determines the capacity of a partnership to sue or be sued. The parties have not raised this question.
 The reference to MER in the caption of the complaint does not, in our view, make MER, the partnership, a named defendant. If the partnership were a defendant, the fact that Smith was a partner would raise a question concerning diversity. See infra, note 6.
 
 
 [2]
 The plaintiff repossessed the mining properties on April 16, 1979, the day it filed this suit. It based its request for $425,000 in damages upon the period before the plaintiff took possession, upon the guarantee to mine 10,000 tons per month, and upon the failure to mine that much or pay any royalties. The plaintiff never requested damages based on the 800,000 ton minimum
 
 
 [3]
 In interpreting a contract which made a broker's commission dependant upon the execution of a contract between the broker's clients and a third party, a New York court construed the word "executed" to mean "performed." Fuller v. Bradley Contracting Co., 183 A.D. 6, 170 N.Y.S. 320, 330 (1918), aff'd, 229 N.Y. 605, 129 N.E. 925 (1920). The Fuller court's interpretation was aided by an additional clause which stated that the broker's commission "shall become due and payable only as and when and in the same proportion as [the clients] receive payment from the purchaser." Id
 
 
 [4]
 Smith, general partner of Missouri-Indiana, furnished $25,000. Two hundred and seventy-five thousand dollars ($275,000) came from 13 others
 
 
 [5]
 The plaintiff does not argue that the agreement itself gives rise to an estoppel apart from the judgment. See Restatement (Second) of Judgments Sec. 27 comment e (1980); Annot. 2 A.L.R.2d 514, 518 (1948). See also Edwards v. Aetna Life Insurance Co., 690 F.2d 595 (6th Cir.1982)
 
 
 [6]
 If MER were a defendant Smith's Missouri citizenship might be attributed to that partnership and thus defeat diversity jurisdiction. The citizenship of general partners certainly must be attributed to their partnerships when determining whether diversity of citizenship exists. Whether the citizenship of limited partners must be so attributed is less clear
 The Supreme Court has said that in determining the citizenship of a limited partnership the federal courts cannot disregard the citizenship of the partners. Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900). See Puerto Rico v. Russell & Co., 288 U.S. 476, 480, 53 S.Ct. 447, 448, 77 L.Ed. 903 (1933); Thomas v. Board of Trustees, 195 U.S. 207, 212-13, 25 S.Ct. 24, 25-26, 49 L.Ed. 160 (1904). Great Southern Fire Proof Hotel concerned a limited partnership with only one class of partner. The Court has not decided whether diversity jurisdiction is defeated by an identity of citizenship between a party and a limited partner in an opposing limited partnership managed entirely by one or more general partners. The courts of appeals have divided on the question. Compare Carlsberg Resources Corp. v. Cambria Savings and Loan Association, 554 F.2d 1254 (3d Cir.1977) with Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 183-84 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966).
 The district court did not label Smith's participation in MER as that of a limited or a general partner. MER's partnership agreement designated Shaw as the general partner and did not classify the interests of Smith and Silkey, other than to recite that Smith, Shaw, and Silkey would be "equal partners." The agreement, however, required all partners to agree before MER could undertake a new venture, and to give express written permission before the general partner could incur any obligations on behalf of the partnership. These provisions and the district court's finding that Smith was closely involved with the defendants' day to day operation of the mining properties and had extensive access to funds in accounts established in MER's name might require that, at least for purposes of determining diversity of citizenship, Smith be treated as a general partner in MER. See Navarro Savings Assn. v. Lee, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); Carlsberg Resources Corp., 554 F.2d at 1262-66 (Hunter, J., dissenting). See also Cedar Point Apartments, Ltd. v. Cedar Point Investment Corp., 693 F.2d 748, 757 n. 11 (8th Cir.1982); Garbo v. Hilleary Franchise Systems, Inc., 479 S.W.2d 491, 497-98 (Mo.App.1972); Ind.Code Sec. 23-4-2-7; Mo.Rev.Stat. Sec. 359.070; Unif. Limited Partnership Act (1916) Sec. 7. ("A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.")
 
 
 [7]
 The parties do not contend that any peculiarity of mining partnerships or mining joint ventures controls this case. See Arrow Petroleum Co. v. Ames, 128 Ind.App. 10, 17, 142 N.E.2d 479 (1957); 58 C.J.S. Mine and Minerals Secs. 245, 251 (1948)
 
 
 [8]
 Thus far Smith has controlled Missouri-Indiana's participation in this litigation. The district court's findings of fact and our review of the record raise serious questions whether Smith's control should continue. See Linder v. Vogue Investments, Inc., 239 Cal.App.2d 338, 48 Cal.Rptr. 633 (1966) (limited partners may intervene to defend partnership after general partner allowed judgment by default); Mishkin v. Willoner, 36 Md.App. 111, 373 A.2d 630 (1977) (limited partners may intervene to contest settlement; strong proof of conflict of interest may disqualify general partner from settling limited partnership's litigation). See also Lerman v. Tenney, 425 F.2d 236 (2d Cir.1970) (derivative action under New York law); Smith v. Bader, 458 F.Supp. 1184 (S.D.N.Y.1978) (derivative action under California law); Riviera Congress Associates v. Yassky, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966) (derivative action under New York law). See also Fed.R.Civ.P. 19